Filed 9/30/20  P. v. Singer CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HENRY ARNOLD SINGER,<br><br>    Defendant and Appellant. | B302163<br><br>(Los Angeles County<br> Super. Ct. No. KA073169) |

APPEAL from an order of the Superior Court of Los Angeles County.  Victor D. Martinez, Judge.  Affirmed.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * * * * * *

Defendant and appellant Henry Arnold Singer appeals from the denial of his petition for resentencing pursuant to Penal Code section 1170.95.

Defendant was one of three individuals charged with the first degree murder of a college student kidnapped, robbed and left for dead in the mountains after her throat was slit. Defendant pled guilty to first degree murder in exchange for a dismissal of the special circumstance allegations and agreed to testify against his codefendants. The record of conviction demonstrates defendant was a major participant who acted with reckless indifference to human life. Defendant is ineligible for resentencing relief under the changes in the law regarding liability for felony murder since his 2007 conviction. We therefore affirm the trial court's order denying defendant's petition.

### FACTUAL AND PROCEDURAL BACKGROUND

In April 2006, defendant was charged, along with codefendant Markeisha Dixon, with one count of first degree murder. (Pen. Code, § 187, subd. (a).) Robbery-murder and kidnapping-murder special circumstances were also alleged. (§ 190.2, subd. (a)(17).) The charges arose from the August 2001 murder of Christina Burmeister. In a separate information, James Dixon was also charged with the Burmeister murder. Neither Markeisha Dixon or James Dixon is a party to this appeal.[1]

Two witnesses testified at the preliminary hearing, Sergeant Joseph Purcell of the Los Angeles County Sheriff's

---

[1] Because of the common surname, we will refer to James Dixon as Dixon and Markeisha Dixon as Markeisha.

Department and Chanson Tyrone.  Sergeant Purcell investigated the death of Ms. Burmeister.  Mr. Tyrone was a witness to the crimes.

On August 18, 2001, a deputy sheriff discovered Ms. Burmeister's body in the front passenger seat of her truck on a gravel turnout on Highway 39 in Azusa Canyon.  Her throat was cut and blood smears in the truck indicated she was killed in that location.  A later autopsy determined the cause of death to be a knife wound to the throat, causing the victim to have "drowned on her own blood."

Sergeant Purcell recovered a cigar butt on the floorboard beneath the driver's seat of the victim's truck.  Later testing established that DNA taken from the cigar butt matched the DNA profile for Dixon.  The investigation also revealed that three ATM withdrawals, totaling $400, were made from Ms. Burmeister's account at Washington Mutual bank within the span of 90 seconds on the evening of August 17, 2001.  Security footage from the bank showed a person making the withdrawals holding the hood of their sweatshirt down to obscure their face.  Ms. Burmeister's family told Sergeant Purcell that she had gone out that night in her new truck to a fraternity party at her college.

Mr. Tyrone testified he was with defendant on the night of August 17, 2001.  They were in San Bernardino walking down the street headed to a liquor store when Dixon and Markeisha pulled up alongside them in a sedan.  Markeisha, who was driving, called over to them and asked if they wanted to go get some "cheese," a slang term for money.  Markeisha lived in the same building as Mr. Tyrone.  He had seen Dixon before with Markeisha and Mr. Tyrone said "[h]e looked crazy."  Both

3

defendant and Mr. Tyrone got into the sedan with Markeisha and Dixon. They pulled onto the freeway and headed toward Pomona.

Markeisha stopped the car on a residential street where some sort of party was going on. Mr. Tyrone noticed Dixon had a handgun in his lap. Markeisha and Dixon got out of the car and walked off. Mr. Tyrone and defendant stayed by the car, talking and smoking cigarettes.

After a few minutes, Dixon returned walking next to a white female unknown to Mr. Tyrone (Ms. Burmeister) who was holding her hands up. Dixon appeared to whisper something in her ear and she put her hands down. They walked toward a blue truck, parked a couple of spaces away from the sedan, and both Dixon and Ms. Burmeister got in the passenger side of the truck. Markeisha said "come on" and then got in the driver's seat of the truck and drove off.

Defendant and Mr. Tyrone got into the sedan, with defendant driving, and followed the truck. They eventually arrived at a Washington Mutual bank in Montclair. Defendant parked the sedan a short distance away from where Markeisha had parked the truck. Markeisha, who was wearing a black hooded shirt, got out of the truck and walked toward the ATM machine. She never said what she was going to do, but it was "pretty easy to figure out." When she was walking back from the ATM, she had money in her hands and was counting it.

Markeisha walked over to defendant and Mr. Tyrone and told them she was having difficulty driving the truck because it was a manual transmission. Defendant, who knew how to drive a manual transmission, got into the truck and drove out of the parking lot, as did Markeisha and Mr. Tyrone in the sedan.

4

They drove to "a secluded little dark area" up in the mountains. Markeisha parked the sedan a little bit away from where defendant parked the truck. Defendant got out of the truck, walked over to the sedan and got in with Markeisha and Mr. Tyrone. Mr. Tyrone could see that Dixon was still in the truck with Ms. Burmeister. After a few moments, he saw Ms. Burmeister appear to grab at her neck "like she was gasping for air or something." Dixon got out of the truck and came back to the sedan. Mr. Tyrone did not see any weapon in his hands. Markeisha then drove them all back to San Bernardino. She and Dixon dropped off defendant and Mr. Tyrone at Mr. Tyrone's apartment.

In November 2007, defendant pled guilty to first degree murder. As part of the plea agreement, defendant agreed to testify against Dixon and Markeisha. Defendant's sentencing was deferred until after he testified at Dixon's trial. (Markeisha pled guilty to first degree murder the day after defendant's plea.)

At Dixon's trial, defendant testified to a version of events that differed from Mr. Tyrone's preliminary hearing testimony in several respects but substantially corroborated the evidence of defendant's major role in committing the crimes.

Defendant testified that on the evening of August 17, 2001, he was driving around in San Bernardino with Mr. Tyrone. They saw Markeisha and Dixon walking on the street and stopped to talk to them. Dixon asked for a ride to Pomona. Defendant said he did not have enough gas to drive there and Dixon offered to pay.

During the drive to Pomona, Dixon suggested they make some money by selling drugs once they arrived. All four of them shared a blunt (a cigar with marijuana rolled inside). Once off

the freeway, defendant followed Dixon's directions to a residential location and parked the car.

Markeisha and Dixon got out of the car, said they would be right back and walked away. Defendant and Mr. Tyrone stayed by the car and finished smoking the blunt. Five to 10 minutes later, Markeisha and Dixon returned, driving a blue truck. They pulled up next to defendant and told him to follow them.

Defendant followed the truck for awhile until they eventually stopped at a bank in Montclair. Defendant parked his car a few spaces away from the truck. He got out of his car and sat on the hood. Mr. Tyrone got out and walked away to make a phone call. Defendant saw Markeisha, who was wearing a hooded sweatshirt, walk over toward the bank. Shortly thereafter, Markeisha came over to defendant. Mr. Tyrone returned and said there was a police car in the parking lot. They all walked a short distance away from the vehicles and watched the police car. Markeisha said they needed to get the truck out of the parking lot.

After they saw the police car leave, they walked back to the truck and Markeisha said she was having trouble driving it because it had a manual transmission. She asked defendant to drive it and he agreed. Markeisha told him there was a "white girl" in the truck or words to that effect.

Before getting into the truck, defendant got a pair of socks from the trunk of his car and put them on his hands because he did not want to leave fingerprints in the truck. When he got into the truck, he noticed that Dixon was not inside and that there was a white female (Ms. Burmeister) lying face down on the floor of the back cab area, with her shirt pulled up over her head and her hands tied behind her back with red lace fabric, apparently

her underwear.  She was "gasping," "moan[ing] in discomfort" and "struggling" to move.  Defendant did not ask if she was alright or do anything to help her.

Defendant, driving the truck, followed the sedan, now driven by Mr. Tyrone with Markeisha as a passenger, out of the parking lot.  Defendant saw Dixon standing on the side of the road and stopped to pick him up.  Before getting in, Dixon pulled Ms. Burmeister from the back and put her in the front passenger seat and then climbed into the back seat behind her.  Defendant asked Dixon what was going on and he pulled out a handgun and told him not to worry about it.  Ms. Burmeister told them to take what they wanted and leave her alone or words to that effect.

When asked why he did not drive away from the others before picking up Dixon, knowing Ms. Burmeister was tied up and in need of assistance, defendant said "foul judgment" and because he was "stoned."  Defendant also said he feared Dixon might use the gun, but conceded Dixon did not point the gun at him or threaten him with it.

Dixon told defendant to get on the freeway and gave him directions to drive up into the mountains of Azusa Canyon.  Eventually, Dixon pointed out a dark turnout area and told defendant to pull over.  Defendant parked the truck and got out, leaving Dixon in the truck with Ms. Burmeister.

Defendant walked over to his car and got in.  He asked for his keys and Markeisha gave them to him.  Markeisha walked over to the truck and stood on the passenger side where Dixon was now standing with the door open.  They appeared to be talking.  Markeisha then walked back to defendant and Mr. Tyrone.  Defendant saw Dixon lean into the truck for a bit,

before closing the door.  As he walked toward defendant's car, Dixon appeared to throw something.

Dixon told defendant to leave and gave him directions back to the freeway.  Dixon told Mr. Tyrone to throw Ms. Burmeister's cell phone out the window, and he did so.

On April 4, 2008, in accordance with the terms of the plea agreement, defendant was sentenced to prison for 25 years to life, and the prosecution dismissed the special circumstance allegations and the allegation defendant had suffered a prior strike conviction in 2002 for robbery.  Defendant was awarded 834 days of custody credits.

In February 2019, defendant filed a petition for resentencing pursuant to Penal Code section 1170.95 which became effective January 1, 2019.  The trial court appointed defendant counsel and the parties submitted briefs.

On October 29, 2019, the court ordered the People to show cause why the petition should not be granted and proceeded with the evidentiary hearing.  The court said it intended to consider the record of conviction, including the abstract of judgment, the information, and the transcript of the preliminary hearing.  The court also said it would consider the transcript of defendant's trial testimony in the Dixon case which had been submitted as an exhibit to defendant's brief.  The court asked counsel if there was any additional evidence to be submitted.  Defense counsel said no and agreed with the court's description of the relevant evidence.  The prosecutor did not have any additional evidence but objected to the consideration of defendant's trial testimony.  The court overruled the objection.

After entertaining argument from the parties, the court denied defendant's petition, finding the evidence supported the

conclusion that, whether analyzed as express malice, implied malice or reckless indifference, "defendant would have been found guilty" and therefore he was ineligible for resentencing.

This appeal followed.

## DISCUSSION

Defendant contends the trial court erred in denying his petition because the record does not contain evidence supporting a first degree felony murder conviction in light of the changes effected by Senate Bill 1437 (2017-2018 Reg. Sess.). Defendant also argues the trial court abused its discretion by relying on an incorrect standard of review in denying his petition. We disagree with both contentions.

Penal Code section 1170.95 was enacted as part of the legislative changes effected by Senate Bill 1437. "Senate Bill 1437 was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.)

With respect to felony murder, Penal Code section 189, subdivision (e), as amended, now provides in relevant part that "[a] participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted

9

the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

Our Supreme Court has explained the evidentiary contours of "act[ing] with reckless indifference to human life" within the meaning of Penal Code section 190.2, subdivision (d). In *People v. Banks* (2015) 61 Cal.4th 788, 807 (*Banks*), the court held that "[r]eckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death." ' " A defendant's "[a]wareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient." (*Id.* at p. 808.) There must be evidence the defendant engaged in conduct "knowingly creating a 'grave risk of death.' " (*Ibid.*) The court reaffirmed this definition a year later in *People v. Clark* (2016) 63 Cal.4th 522, 623.

We conclude the record amply supports defendant's guilt of first degree felony murder on a theory he was a "major participant in the underlying felony and acted with reckless indifference to human life." (Pen. Code, § 189, subd. (e)(3).)

*Banks* cites a nonexhaustive list of factors articulated in *Tison v. Arizona* (1987) 481 U.S. 137, 157 that courts may consider in analyzing a defendant's participation in criminal activity and whether it carries a grave risk of death. Those factors are: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at

10

the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Banks*, *supra*, 61 Cal.4th at p. 803.)  None of the factors is required nor is any factor dispositive, and other factors may be relevant.  (*Ibid*.)

Several of the enumerated factors are present here.  Defendant agreed to drive the truck in which the victim was bound.  Defendant was aware the victim was bound, face down, on the floor of the truck's back cab and was "gasping," "moan[ing]" and "struggling" to move.  He was alone with the victim as he left the bank parking lot and could have driven off, leaving the others behind and taking the victim to a place of safety.  Instead, defendant stopped and picked up Dixon and drove a significant distance to a secluded mountain location.  Once up in the mountains, he left the victim alone in the truck with Dixon, knowing Dixon had a handgun.  Defendant drove all the accomplices from the scene of the crime.  Once back home, defendant did nothing to summon aid for the victim.  These facts distinguish this case from *In re Scoggins* (2020) 9 Cal.5th 667, where the Supreme Court found the defendant did not act with reckless indifference to human life because he was not present at the crime scene, could not see the confrontation that led to the killer's use of force, did not know the killer had a gun or would use lethal force, and after the shooting, went to check if the victim was still breathing and stayed to give a police interview.

Defendant was a major participant in the crimes, and his behavior demonstrated a reckless disregard for the life of Ms. Burmeister.  The trial court did not err in concluding, beyond

11

a reasonable doubt, that defendant was ineligible for resentencing.

Defendant also argues the trial court used the wrong legal standard in reviewing his petition. The argument is without merit. Penal Code section 1170.95, subdivision (d)(3) provides in pertinent part that "[a]t the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing."

The court here stated it had analyzed the evidence presented and concluded defendant would have been found guilty under any theory of murder. The court acknowledged the relevance of *Banks* and found the facts supported felony murder. The court's ruling is not infirm simply because the trial court did not expressly recite that it found the prosecution had met its burden of showing ineligibility beyond a reasonable doubt.

Defendant points out the trial court stated that "the People *could have* proceeded on an express murder, [an] express malice case." This does not support a conclusion the court relied upon an incorrect legal standard. The court stated this only to emphasize that while the evidentiary record plainly supported guilt beyond a reasonable doubt under a *Banks* felony murder theory, it believed the evidence was strong enough to prove express malice. The statement emphasized the court's view of the strength of the evidence against defendant, not the use of an improper standard.

## DISPOSITION

The trial court's order denying Henry Arnold Singer's petition for resentencing is affirmed.

GRIMES, Acting P. J.

WE CONCUR:

STRATTON, J.

WILEY, J.